UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CHRISTOPHER GOOD, individually, and as Administrator of the Estate of RYLIE GOOD, deceased, and ELISA GOOD, individually,<br><br>    Plaintiffs,<br><br>v.<br><br>AMAZON.COM SERVICES LLC, a Delaware Limited Liability Company, and AMAZON.COM, INC., a Delaware Corporation,<br><br>    Defendants. | CASE NO.<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

COMES NOW CHRISTOPHER GOOD, individually and as Administrator of the Estate of RYLIE GOOD, and ELISA GOOD, individually (together, "Plaintiff"), by and through the undersigned counsel, and for Plaintiff's causes of action against Defendants Amazon.com Services LLC and Amazon.com, Inc. (collectively "Amazon" or "Defendants") state as follows:

COMPLAINT
PAGE - 1

CORRIE YACKULIC LAW FIRM, PLLC
101 YESLER WAY, SUITE 600
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

## I.    **INTRODUCTION**

1.    This action arises from the Defendants' wrongful conduct in connection with the marketing and online sale of nitrous oxide products for recreational use as an intoxicant. Although known to be dangerous when inhaled, Defendants knowingly distributed, marketed, promoted and sold canisters of nitrous oxide that invite and enable recreational use as an inhalant while maintaining only the thinnest pretext that the product is a culinary aid intended for making whipped cream.

2.    The facade that Defendants are selling nitrous oxide to chefs bears little resemblance to reality. Although nitrous oxide canisters may state (usually in relatively small type) that the product is for "food purposes" and not to be inhaled, every aspect of Defendants' marketing and Amazon's online presentation of nitrous oxide products is designed to override that warning and attract illicit recreational users. Defendants are offering nitrous oxide in giant canisters (hundreds of times the size of the typical 8g chargers used in whipped cream dispensers) that are ideal for repeated inhalation but implausible for baking. Their nitrous oxide products bear edgy names and bright colors that nod toward drug culture, not the food industry.  The nitrous oxide is also pre-flavored as "blue raspberry" or "vanilla cupcake" to increase its appeal as an inhalant—despite making it less suitable for actual food preparations.  Defendants' nitrous oxide products are accompanied by, or promoted alongside, nozzles, masks, balloons and other paraphernalia that aid inhalation of the gas but serve no legitimate kitchen-related purpose. In the face of relentless signaling that nitrous oxide inhalation is safe, fun, and pleasurable, Defendants know (and profit from) the

COMPLAINT
PAGE - 2

CORRIE YACKULIC LAW FIRM, PLLC
101 YESLER WAY, SUITE 600
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

fact that the nitrous oxide products' minimal warnings are wholly deficient to convey the products' true dangers.

3.    Defendants are aware that customers are buying nitrous oxide canisters for use as a recreational drug. Amazon has built its business upon surveillance and analysis of customers' purchasing activities.  Although Amazon uses such information to manipulate customer behavior to increase profits, it has failed to take reasonable steps – such as limiting purchases, removing products, or sending warning information – when the volume and frequency of customers' nitrous oxide purchases clearly indicate that those products were being purchased for dangerous recreational inhalation rather than culinary use.

4.    Defendants also sell numerous devices that promote recreational inhalation of nitrous oxide, including but not limited to nozzles used to transfer the nitrous oxide from the pressurized tank or cannister directly into the mouth, face masks similar to those used to deliver oxygen, hoses and pressure regulator gauges for nitrous delivery from cannisters or tanks and portable nitrous oxide cases.

5.    The ready online availability of nitrous oxide products has caused an explosion in recreational nitrous oxide use that researchers describe as a "public health crisis."[1]  Deaths attributed to nitrous oxide spiked by more than 500% between 2010 and 2023.[2]  Emergency room visits for nitrous oxide misuse have also risen dramatically. One researcher has commented "[w]ithout any type of regulatory intervention, deaths and

---

[1] Yockey, Andrew, *Americans are Using Laughing Gas as a Drug. Here are the Dangers*. Real Clear Science (May 13, 2025), available at:
https://www.realclearscience.com/articles/2025/05/13/americans_are_using_laughing_gas_as_a_drug_here_are_the_dangers_1109815.html.

poisonings from nitrous oxide will increase at an accelerating rate and become a tremendous public health issue."[3]

6.      Defendants have capitalized on the nitrous oxide epidemic. By feigning a legitimate purpose, Defendants have not only enabled, but encouraged, widespread use of a substance never intended for human consumption at such doses—creating foreseeable and preventable harm that Defendants have ignored in pursuit of profit.

## II.      PARTIES

### A.      Plaintiff

7.      Plaintiffs Christopher Good and Elisa Good are Rylie Good's parents.  They reside in the State of Georgia.  Plaintiff Christopher Good has been appointed administrator of the Estate of Rylie Good ("Decedent"). Decedent is also survived by three minor children. Plaintiff Christopher Good maintains this action in a representative capacity for the Estate's benefit as well as individually on his own behalf.  Elisa Good maintains this action individually on her own behalf. Plaintiffs Christopher Good, Elisa Good, and the Estate of Rylie Good, will be referred to as "Plaintiff" throughout.

### B.      Defendants

8.      Defendant **Amazon.com Services LLC** ("Amazon Services") is a limited liability company organized in Delaware with its principal place of business in Seattle, Washington.   At all relevant times, Amazon Services was engaged in the business of

---

[2] The University of Mississippi, *Nitrous Oxide deaths Spike by More Than 500%, Study Finds*, available athttps://olemiss.edu/news/2025/07/nitrous-oxide-deaths-spike-by-more-than-500-study-finds/index.html.

[3] Simmons, Ethan, *New study reveals nitrous oxide misuse deaths are steeply* increasing, University of Illinois Urbana Champaign (July 31, 2025), available at: https://ahs.illinois.edu/new-study-reveals-

CORRIE YACKULIC LAW FIRM, PLLC
101 YESLER WAY, SUITE 600
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

marketing, promoting, selling, and/or distributing nitrous oxide-filled canisters. Upon information and belief, Amazon Services is a wholly owned subsidiary of Amazon Inc.

9. Defendant **Amazon.com, Inc.** ("Amazon Inc.") (collectively with Amazon Services, "Amazon") is a Delaware corporation with its principal place of business in Seattle, Washington. At all relevant times, Amazon Inc. was engaged in the business of marketing, promoting, selling, and/or distributing nitrous oxide-filled canisters.

### III.    JURISDICTION AND VENUE

10. This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1332(a). Plaintiff and each Defendant are citizens of different states. Plaintiff is seeking damages and other relief in an amount that exceeds $75,000, exclusive of interest and costs.

11. Defendants reside in and have substantial, systematic, and continuous contact with the State of Washington such that the exercise of personal jurisdiction is fair, just, and appropriate. All parties transact business in Washington, avail themselves of the privilege of conducting business in Washington, and have sufficient minimum contacts with Washington, such that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310 (1945).

12. Venue is appropriate in this district under 28 U.S.C. § 1391(b) because Amazon resides in this district. Venue is further appropriate in this district because Defendants sold or distributed products out of this district such that a substantial part of the events or omissions giving rise to the claim occurred in this district.

nitrous-oxide-misuse-deaths-are-steeply-increasing/; Yockey RA, Hoopsick RA. *US Nitrous Oxide*

CORRIE YACKULIC LAW FIRM, PLLC
101 YESLER WAY, SUITE 600
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

## IV.    FACTUAL ALLEGATIONS

### A.    THE GROWING NITROUS OXIDE EPIDEMIC

13.    Nitrous oxide is a colorless, odorless, non-flammable gas.

14.    Nitrous oxide was discovered more than two centuries ago. Humans quickly recognized the psychoactive effect of nitrous oxide and its potential for recreational use—as reflected by "laughing gas" exhibits at fairs.

15.    While its psychoactive effects were known, illicit recreational use of nitrous oxide was constrained for a long time because the gas was inconvenient to acquire. The first spike in recreational nitrous oxide use came between 1970 and 1990 when small 8g whipped cream chargers, known as "whippets," were introduced. A second spike in nitrous oxide use began around 2015, when nitrous oxide transitioned from small, non-descript single-use chargers to brightly colored, high-volume industrial canisters. The large volume canisters allowed for hundreds of doses, continual inhalation, group use, and binge use. The large canisters of nitrous oxide were sold, not at culinary supply stores, but at smoke shops, gas stations, convenience stores and other establishments that catered to customers seeking recreational intoxication.

16.    There are legitimate purposes for which nitrous oxide can be legally sold and used.  One such use is as a pain reliever and numbing agent for dental procedures.  When used clinically, a 30%-50% concentration of nitrous oxide mixed with oxygen is used for safety reasons; nitrous oxide, once inhaled, displaces oxygen in the body, so mixing it with oxygen reduces the risks of oxygen deprivation and hypoxia.  When administered for medical

*Mortality.* JAMA Netw Open. 2025;8(7):e2522164. doi:10.1001/jamanetworkopen.2025.22164.

COMPLAINT
PAGE - 6

and dental procedures, the Federal Food, Drug, and Cosmetic Act treats it as a "designated medical gas," subjecting it to specific labeling, usage, and regulatory constraints that limit its accessibility to recreational users. *See* 21 U.S.C. §§ 360ddd(1)(C); 360ddd-1.   These regulations limit the availability of nitrous oxide for medical use, making it less accessible to recreational users.

17.    A second legitimate use for nitrous oxide is as a whipping propellant or aerating agent for food products.  This "culinary" use is regulated far more permissively than medical use. Nitrous oxide sold for culinary use is subject to no restrictions beyond compliance with current good manufacturing practices. *See* 21 C.F.R. § 184.1545 (Feb. 14, 2008).

18.    Defendants have capitalized on the permitted and lightly-regulated use of nitrous oxide for culinary purpose – such as for charging whipped cream dispensers – as a pretext for selling nitrous oxide for recreational use.

19.    Nitrous oxide, when inhaled, causes users to become dizzy, light-headed, and giggly. It can produce feelings of euphoria, dissociation, and out-of-body experiences. [4] Nitrous oxide can also have anti-anxiety effects.[5]  The "high" from nitrous oxide is brief but very intense.

20.    Food-grade nitrous oxide is sold in canisters that come in various sizes ranging from small 8g metal chargers, commonly used in whipped cream dispensers, to large 3000g tanks.

---

[4] van Amsterdam J, Nabben T, van den Brink W. Recreational nitrous oxide use:  prevalence and risks. Regul Toxicol Pharmacol 2015;73:790–6.
[5] *Id.*

COMPLAINT
PAGE - 7

CORRIE YACKULIC LAW FIRM, PLLC
101 YESLER WAY, SUITE 600
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

21.     Users can release the nitrous oxide from the canister in several ways.  Some nitrous oxide canisters are packaged together with nozzles, or purchased with nozzles, that allow the gas to be immediately accessed once purchased. Other canisters, particularly large canisters, incorporate release valves that permit the user to start and stop the flow of gas making it more convenient to take multiple inhalation "hits" from the large container. The small 8g nitrous oxide chargers can also be placed in whipped cream dispensers, or "crackers," that puncture the container allowing the gas to be inhaled.

22.     It is common for recreational users of nitrous oxide to release the gas from canisters into a balloon before inhaling it from the balloon. This method allows the extremely cold pressurized gas to warm before inhalation, thereby lessening the risk of damage to lungs, vocal cords, and other tissue.

23.     When inhaled in these ways, nitrous oxide is ingested in pure or close to pure form (without combination with an appropriate concentration of oxygen).  Ingestion of nitrous oxide in pure form results in diminished blood oxygen levels or hypoxia which can cause numerous adverse health events including damage to the brain, heart, or other organs and sometimes death.

24.     Nitrous oxide is widely used and addictive. According to a 2019 survey by the U.S. Substance Abuse and Mental Health Services Administration, approximately 12.64 million Americans aged 12 and older had misused nitrous oxide in their lifetime.[6]  Research evaluating recreational use has found that a substantial proportion of heavy nitrous oxide users meet multiple DSM-5 substance use disorder criteria—including using more than

---

[6]https://www.samhsa.gov/data/sites/default/files/reports/rpt29394/NSDUHDetailedTabs2019/NSDUHDetTabsSect1pe2019.htm?s=nitrous&#tab1-97a

CORRIE YACKULIC LAW FIRM, PLLC
101 YESLER WAY, SUITE 600
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

intended, spending significant time using, and experiencing interpersonal problems due to use—supporting the addictive potential of nitrous oxide.[7]

25.     The ready accessibility of nitrous oxide has caused an explosion in recreational nitrous oxide use that researchers have described as a "public health crisis."[8] Deaths attributed to nitrous oxide abuse have jumped more than 100% between 2019 and 2023.[9]   Emergency room visits, poison control calls, and hospitalizations related to recreational nitrous oxide inhalation have increased. Researchers warn that the trend could continue to worsen.

**B.     INJURIES ASSOCIATED WITH INHALING NITROUS OXIDE.**

26.     Inhalation of nitrous oxide directly from a pressurized source can severely damage tissue in the form of frostbite to the lips, mouth, throat, vocal cords, and lungs. The temperature of the nitrous canisters can also cause severe burns to the face, neck, stomach, arms, legs, and feet.

27.     Inhalation of high concentrations of nitrous oxide (particularly when not mixed with an appropriate concentration of oxygen) deprives the body of oxygen. Depriving the brain of oxygen can cause hypoxia, nerve damage, unconsciousness, and even death.

28.     Chronic nitrous oxide inhalation disrupts vitamin B12 metabolism causing a B12 deficiency. Vitamin B12 deficiency in turn interrupts the body's ability to engage in the

---

[7] Back S, Kroon E, Colyer-Patel K, Cousijn J. Does nitrous oxide addiction exist? An evaluation of the evidence for the presence and prevalence of substance use disorder symptoms in recreational nitrous oxide users. Addiction. 2024 Apr;119(4):609-618. doi: 10.1111/add.16380. Epub 2023 Oct 30. PMID: 37904333.

[8] Yockey, Andrew, Americans are Using Laughing Gas as a Drug. Here are the Dangers. Real Clear Science (May 13, 2025), available at: https://www.realclearscience.com/articles/2025/05/13/americans_are_using_laughing_gas_as_a_drug_here_are_the_dangers_1109815.html.

COMPLAINT
PAGE - 9

CORRIE YACKULIC LAW FIRM, PLLC
101 YESLER WAY, SUITE 600
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

methylation of myelin proteins, leading to the demyelination of nerve cells. Demyelination refers to the destruction or degradation of myelin, which leaves nerve cells exposed and vulnerable. Demyelination causes many serious health problems including severe neuropathy, paralysis, vision impairment or loss, muscle weakness and fatigue, impaired coordination, diminished or intensified touch sensitivity, cognitive impairment, and depression. B12 deficiency can also cause a bone spur on the cervical spine, causing the health problems above.

29.    Because nitrous oxide inhalation also introduces dissociative and disorienting feelings, it poses a risk for acute physical injury from falls or other mishaps should the user attempt to stand, walk, or operate machinery while under its effects.

30.    Nitrous oxide side effects include nausea, vomiting, dizziness, unconsciousness, B12 deficiency, which can result in numbness in fingers and toes, neuropathy, ataxia, Deep Vein Thrombosis (from B-12 deficiency, severe dehydration and immobility), severe burns, nerve damage, neurologic and psychiatric illness, lung collapse, blood vessel hemorrhage in the lungs, heart attacks, seizures, comas, asphyxiation, and death.[10]   The repeated use of nitrous oxide can cause serious and permanent physical and neurological injuries. Nitrous oxide has been tied to numerous injuries and deaths.

31.    The FDA has summarized the risks associated with recreational nitrous oxide use:

> Inhaling nitrous oxide can result in a range of symptoms and serious health problems, from abnormal blood counts,

---

[9] *Id.*

[10] Campdesuner V, Teklie Y, Alkayali T, Pierce D, George J. Nitrous Oxide-Induced Vitamin B12 Deficiency Resulting in Myelopathy. Cureus. 2020 Jul 9;12(7):e9088. doi: 10.7759/cureus.9088. PMID: 32685323; PMCID: PMC7366039.

CORRIE YACKULIC LAW FIRM, PLLC
101 YESLER WAY, SUITE 600
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

asphyxiation, blood clots, frostbite, headache, impaired bowel and bladder function, lightheadedness, limb weakness, loss of consciousness, numbness, palpitations, paralysis, psychiatric disturbances (delusions, hallucinations, paranoia, depression), tingling, trouble walking, vitamin B12 deficiency, and in some cases, death. For some individuals who regularly inhale nitrous oxide, this habit can lead to prolonged neurological effects, including spinal cord or brain damage, even after stopping use.[11]

32.     Despite the many harms associated with nitrous oxide inhalation, most recreational nitrous oxide users are unaware of its harm potential. One study found that 77% of users reported ignorance of the potential harmful effects of nitrous oxide inhalation.[12]

### C.     NITROUS OXIDE PRODUCTS MARKETED AND SOLD BY DEFENDANTS WERE AIMED AT CUSTOMERS SEEKING RECREATIONAL DRUGS.

33.     Nitrous oxide is particularly dangerous because it is made readily available for illicit purposes through a pretextual distribution chain maintained by Defendants. The ready availability of nitrous oxide causes consumers to mistake its accessibility for harmlessness when, in actuality, its dangers can be quite severe.[13]

34.     After 2010, Defendants began promoting, distributing, marketing, and selling much larger nitrous oxide containers than the 8g chargers that had been commonly sold at restaurant supply stores.

---

[11] U.S. Food & Drug Administration, FDA Advises Consumers Not to Inhale Nitrous Oxide Products (the "FDA Advisory"), https://www.fda.gov/food/alerts-advisories- eafety-information/fda-advises-consumers-not-inhale-nitrous-oxide-products.

[12] Van Amsterdam, J, Nitrous oxide-induced reproductive risks: Should recreational nitrous oxide users worry, Journal of Psychopharmacology 2022, Vol. 36(8) 951–955, available at https://journals.sagepub.com/doi/pdf/10.1177/02698811221077194

[13] Gardin TM, Yang A, Moeller JJ, *et al.* Subacute combined degeneration of the spinal cord in a patient with nitrous oxide use and autoimmune atrophic gastritis *BMJ Case Reports CP* 2023; 16**:**e254727.

COMPLAINT
PAGE - 11

35.    These large nitrous oxide canisters are grossly mismatched to any legitimate culinary purpose. In kitchen use, whipped cream is made using small chargers (typically 8g each) or modest bulk systems designed for continuous service. Tanks holding as much as 3000g of nitrous oxide, by contrast, contain the equivalent of 375 standard 8g chargers and would produce nearly 100 gallons of whipped cream; an amount that equates to over six thousand ¼ cup servings. That is far more than the typical restaurant, bakery, or caterer (let alone home cook) could use before spoilage, sanitation and quality concerns rendered the whipped cream unstable. It is implausible that any individual consumer would have a culinary need for that volume of nitrous oxide.

36.    Defendants' profit model for large canisters of nitrous oxide products depends on consumers purchasing them for recreational inhalation because there is no meaningful market for large, flavored nitrous oxide canisters outside of that use.  That this is true is demonstrated by the websites for legitimate restaurant supply businesses like Sysco, US Foods and Webstaurant Store – which all list for sale traditional nitrous oxide charger capsules containing around 8 grams of unflavored nitrous oxide; but none list for sale enormous, colorful containers of flavored nitrous oxide.

37.    Many of the nitrous oxide products distributed and sold by Defendants feature brightly colored packaging intended to make the products appealing to youths and young adults.

38.    Many of the nitrous oxide products distributed and sold by Defendants have names that feature slang words connecting the nitrous oxide products with the drug community, not the culinary community.

COMPLAINT
PAGE - 12

CORRIE YACKULIC LAW FIRM, PLLC
101 YESLER WAY, SUITE 600
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

39.     Use of flavorings in nitrous oxide is a strong indicator of non-culinary intent. Flavorings added to nitrous oxide are inconsistent with legitimate culinary use in making whipped cream but are highly attractive for recreational inhalation. In culinary applications, flavor is introduced into the cream itself (through sugar or other ingredients), not into the propellant gas. Adding flavorings to the gas serves no functional culinary role and actually undermines food quality control by introducing uncontrolled tastes and aromas into the product. For that reason, websites for legitimate restaurant supply businesses like Sysco, US Foods and Webstaurant Store do not sell flavored nitrous oxide of any kind.  By contrast, flavorings are desirable for inhalation because they make the gas more palatable and encourage repeated use.

40.     Some nitrous oxide canisters are packaged together with a nozzle or marketed alongside nozzles. There is no need for a nozzle when the nitrous oxide is used for standard culinary applications. Whipped cream dispensers have a built-in valve and dispensing nozzle. They are charged by either a small nitrous oxide charger that is punctured inside the dispenser or through a regulated hose from a bulk tank. In either case, the whipped cream dispenser itself controls the gas release with no external nozzle required. From a legitimate food-service perspective, marketing, packaging, promoting, or selling nitrous oxide with a nozzle is unnecessary. From a recreational consumer's perspective, inclusion of a nozzle enables direct gas release, which is how recreational users inhale nitrous oxide. The main purpose of the nozzle is to allow the nitrous oxide to be immediately accessed without connecting to regulator or dispenser.  Using a nozzle to directly consume nitrous oxide from a nitrous oxide container is dangerous, however, as it increases the risk of frostbite to the

COMPLAINT
PAGE - 13

CORRIE YACKULIC LAW FIRM, PLLC
101 YESLER WAY, SUITE 600
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

lips, mouth, throat, vocal cords, and lungs. Use of a nozzle is also dangerous because it allows for near continuous inhalation of nitrous oxide (as compared to a balloon, which must be repeatedly filled), greatly increasing the health dangers outlined above.

41. The release valve offered on some large nitrous oxide canisters makes it easier for illicit users to inhale nitrous oxide because it lets them control how much gas comes out at a time instead of it blasting out all at once. Recreational users frequently fill a balloon from a canister or cylinder and then inhale from the balloon, which is safer than breathing straight from the metal because the gas coming directly out is extremely cold and under high pressure. With a release valve, a user can gently open the flow, fill balloons repeatedly, and stop and start the gas as needed, which both reduces the risk of frostbite from direct discharge and makes it more convenient to take multiple inhalation "hits" from the same container.

42. Nitrous oxide products are heavily marketed on social media, including by engaging private social media influencers that have no legitimate connection to the culinary industry.

43. Large nitrous oxide canisters are frequently displayed alongside paraphernalia that has no legitimate culinary purpose but clearly signals inhalant use—reinforcing that the expected use of the product is for recreational inhalation, not food prep. Commonly associated items include balloons, balloon packs, and "crackers" or dispensers for releasing the compressed gas. In some instances, nitrous oxide products are linked to tubing, mouthpieces, and masks to reduce the discomfort of repeated inhalation. These tools are unnecessary for making whipped cream but widely associated with inhalant consumption.

CORRIE YACKULIC LAW FIRM, PLLC
101 YESLER WAY, SUITE 600
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

Associating nitrous oxide canisters with drug paraphernalia signaled to Decedent and other consumers that the nitrous oxide products marketed, distributed, and sold by Defendants were appropriate for use as inhalants.

### D. DEFENDANTS FAILED TO ADEQUATELY WARN THEIR CONSUMERS ABOUT THE KNOWN DANGERS OF INHALING NITROUS OXIDE.

44. Defendants knew or should have known about the illicit market for nitrous oxide.

45. Based on sales patterns (including, but not limited to, frequency of nitrous oxide purchases, volume of nitrous oxide purchases, types of nitrous oxide products purchased, and paraphernalia purchased alongside nitrous oxide products) Defendants knew or should have known that the nitrous oxide products they produced, marketed and sold were being purchased by certain of their customers for recreational use via inhalation.

46. Amazon, in particular, has substantial knowledge of customer's identities and behaviors. Knowing the product offerings their customers interact with, and ultimately purchase, is at the core of Amazon's business.

47. Amazon builds surveillance into its platforms and products, traffics user information, and feeds data into tailored algorithms that produce insights about users that boost sales. Amazon's knowledge and understanding of its customers is often much greater than what a typical retailer would know about a prospective customer.

48. Amazon collects information about customers from its websites, its smart devices (such as Alexa), its numerous subsidiaries (such as the health clinic OneMedical) and even by purchasing data from other companies. The information that Amazon collects

COMPLAINT
PAGE - 15

CORRIE YACKULIC LAW FIRM, PLLC
101 YESLER WAY, SUITE 600
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

includes but is not limited to: (1) what customers search for, (2) what customers watch, (3) the duration of time customers spend on different product pages, (4) whether and when customers click on links or buttons, (5) whether or not the customer scrolled to product reviews, (6) what customers have said in their own product reviews, (7) what reminders the customer has set for life events, (8) who the customer's contacts are, and (9) what the customer says to their smart devices.

49.    By collecting and combining this information in near real-time, Amazon is able get a comprehensive understanding of its customers' lives and predict their behaviors. Amazon uses this information to influence customer behaviors by making targeted recommendations to customers.

50.    On product pages for nitrous oxide canisters, Amazon featured other items for sell under the heading "Products related to this item."  Dispenser nozzles that attach to the nitrous oxide canisters were promoted by Amazon in this area – signifying that nozzles are intended for use together with nitrous oxide canisters.  The image below is representative of what customers were presented as "related" items when on the product page for a large nitrous oxide canister:

CORRIE YACKULIC LAW FIRM, PLLC
101 YESLER WAY, SUITE 600
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725



51.      The nozzles Amazon promotes as being "related" to nitrous oxide canisters are used for venting the gas into a balloon for inhalation or, more dangerously, directly into a consumer's mouth or lungs.  That the nozzles sold by Amazon are intended to be placed in one's mouth is demonstrated by the fact that some of the nozzles are promoted as candy or fruit flavored.

COMPLAINT
PAGE - 17



52.      Nothing in the nozzle description explains what role such a nozzle would play in dispensing whipped cream.  Product images depict the nozzles being used to vent gas, not to dispense whipped cream. Consumer comments for the nozzles also reflect their true intended purpose as aids to the recreational inhalation of nitrous oxide by referencing their smell, taste and functionality as a "cracker" (which is slang for a mechanical device used to break the seal on a traditional nitrous charger capsule).



COMPLAINT
PAGE - 18

53.    Inhaling nitrous oxide directly from a nozzle (as compared to the use of gas-filled balloons) greatly increases the danger.  It increases the risk of frostbite to the lips, mouth, throat, vocal cords and lungs.  It also increases the risks of hypoxia and oxygen deprivation.

54.    Comments regarding nitrous oxide canister products on the electronic commerce pages maintained by Amazon also referenced the actual intended purpose for which many customers bought nitrous oxide products: i.e., for recreational inhalation to experience psychoactive effects. The following comments are representative of reviews left on Amazon pages for nitrous oxide products:

- "Best high ever.  My friends and I hit this stuff so much, passing it around like candy."[14]
- "Stuff gave me a rush of dopamine and euphoric relief as it kills my brain cells and massages the back of brain."
- "This stuff is really clean.  If you are using it for Balloons, you don't need to buy the regulator. a small white tip comes with each bottle for that. Heh heh."
- "Tastes like medical grade."
- "Don't buy the flavored tanks [because] its gross to breathe in once the included filter gets overwhelmed."
- "Absolutely wonderful and a thousand percent recommended but get the valve kit to connect to your cracker and don't use the little nozzle that comes with it or you will burn your lips and it hurts for a week."

These and similar reviews made it clear to Defendants that consumers were inhaling the nitrous oxide products to feel psychoactive effects.

---

[14]Jeremy Finley, "WSMVR Investigates: Users of nitrous oxide describe 'best high ever' in reviews of canisters on Amazon", Sept. 17, 2025, available at: https://www.wsmv.com/2025/09/17/wsmv4-investigates-users-nitrous-oxide-describe-best-high-ever-reviews-canisters-amazon/?utm_source=chatgpt.com

COMPLAINT
PAGE - 19

55.     Defendants were aware of the harm that is caused by their unethical and unreasonable practices, including the fact that individuals who purchase and ingest nitrous oxide are subjected to an array of dangers and harms. Defendants also knew or should have known that multiple states have enacted laws and regulations prohibiting or regulating recreational inhalation of nitrous oxide, including statutes criminalizing possession for purposes of inhalation, use to intoxicate, and the sale of nitrous oxide to individuals under the age of 18.

56.     Despite knowledge that their nitrous oxide products were being purchased for recreational use and despite knowledge of the harm inhaling nitrous oxide could cause their customers, Defendants chose to sell nitrous oxide to consumers, including Decedent, that they knew were purchasing the nitrous oxide to use for dangerous, recreational purposes.

57.     Despite knowledge that their nitrous oxide products were being purchased for recreational use and despite knowledge of the harm inhaling nitrous oxide could cause their customers, Defendants did not adequately warn consumers about the risks associated with inhaling nitrous oxide.

58.     The warning language included on Defendants' nitrous oxide products was wholly inadequate to warn consumers about the nature, extent, and severity of the dangers of inhaling nitrous oxide. Some nitrous oxide canisters include language (usually in small type) on the label to the effect that the product is "For Food Purposes Only."  This mildly worded warning is inadequate to convey the risk of serious physical injury or death. To the contrary, describing the product as "food" suggests to customers that the product is safe to ingest because it is intended for "food" purposes. A false image of safety is further promoted by

COMPLAINT
PAGE - 20

CORRIE YACKULIC LAW FIRM, PLLC
101 YESLER WAY, SUITE 600
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

flavoring the gas like food items including "vanilla cupcakes" or "banana cream pie." Some nitrous oxide canisters include language (again usually in small type) saying "Do Not Inhale" on the product packaging. The seriousness of such a warning is minimized, however, by instructions to merely "remove person to fresh air" if inhaled.

59. Defendants failed to advise consumers as to the addictive potential of recreational nitrous oxide inhalation or about the specific diseases or injuries that could result from consuming the nitrous oxide in the manner Defendants expected.

60. Defendants failed to advise consumers that inhaling the nitrous oxide canisters in the manner Defendants expected—directly from the canister or from a balloon, but, in either case, unmixed with oxygen—would place consumers at risk for hypoxia, asphyxiation, demyelination, nerve damage, blood clots, frostbite, headaches, impaired bowel and bladder function, lightheadedness, limb weakness, loss of consciousness, numbness, palpitations, paralysis, psychiatric disturbances (delusions, hallucinations, paranoia, depression), tingling, trouble walking, vitamin B12 deficiency, and in some cases, death.

61. In March of 2025, the FDA issued a warning advising consumers not to inhale nitrous oxide products from any size canisters, tanks or chargers". The FDA Advisory listed numerous specific brands associated with large canisters of nitrous oxide purportedly being sold for culinary use but actually intended for use as inhalants. The FDA Advisory specifically referenced Amazon as a conduit for the sale of these products.

62. Even after the FDA Advisory, Defendants continued to promote and sell nitrous oxide products without warning consumers of the dangers associated with

COMPLAINT
PAGE - 21

recreational inhalation of nitrous oxide. Defendants did not amend the product packaging or the Amazon product pages or electronic commerce sites to disclose the risks identified by the FDA.

63. Defendants did not include information about the dangers of inhaling nitrous oxide or mention the FDA Advisory on the Amazon page for "Recalls and Product Safety Alerts." The image below reflects the absence of any information regarding recalls and alerts involving "nitrous" on the Amazon "Recalls and Product Safety Alerts" page:

64. After the FDA Advisory, Defendants continued to promote, distribute and sell nitrous oxide products, including nitrous oxide products directly named in the March 2025 FDA Advisory, without additional warnings and without taking steps to monitor or identify sales patterns that were indicative of recreational inhalation.

COMPLAINT
PAGE - 22

CORRIE YACKULIC LAW FIRM, PLLC
101 YESLER WAY, SUITE 600
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

**E.    DECEDENT PURCHASED NITROUS OXIDE FROM AMAZON, USED IT IN THE MANNER DEFENDANTS EXPECTED, AND SUFFERED INJURIES.**

65.    Decedent was in her mid-20's at the time she was purchasing nitrous oxide products from the Amazon website.

66.    Plaintiff was a mother of three young children. She and her parents were close.

67.    Decedent began purchasing nitrous oxide products for inhalation on or around October of 2023.  She continued using nitrous oxide products for recreational inhalation from October 2023 until May 2024.

68.    During this time, Decedent consumed nitrous oxide products daily; a rate of use enabled by regular purchases of nitrous oxide products from Amazon.  Decedent's order history, as reflected on Decedent's Amazon account, includes the following purchases of nitrous oxide products:

- November 15, 2023 - Decedent purchased strawberry flavored Galaxy Gas

- November 16, 2023 - Decedent purchased strawberry flavored Galaxy Gas

- November 18, 2023 - Decedent purchased an eight flavor variety pack of Galaxy Gas

- December 4, 2023 - Decedent purchased blueberry flavored Galaxy Gas

- December 6, 2023 - Decedent paid $229 for an eight flavor variety pack of Galaxy Gas

- January 3, 2024 - Decedent purchased vanilla cupcake flavored Galaxy Gas

- February 3, 2024 - Decedent purchased blue raspberry flavored Galaxy Gas

COMPLAINT
PAGE - 23

- February 11, 2024 - Decedent purchased vanilla cupcake flavored Galaxy Gas

- February 11, 2024 - Decedent purchased grape soda flavored Galaxy Gas

- February 15, 2024 - Decedent purchased grape soda flavored Galaxy Gas

- March 2, 2024 - Decedent paid $48.99 to purchase grape soda flavored Galaxy Gas

69.     The volume, frequency, and nature of Decedent's purchases could only have been consistent with persistent recreational use rather than culinary use.

70.     The nitrous oxide products sold to Decedent were marketed, packaged, and sold in a manner consistent with recreational inhalation, including but not limited to: (a) oversized large-capacity canisters far exceeding culinary needs, (b) branding, flavoring, and labeling appealing to recreational users, (c) promotion of nitrous oxide products alongside paraphernalia and accessories associated with drug-use, and (d) the absence of meaningful warnings regarding the risks and dangers of nitrous oxide inhalation.

71.     Defendants knew or should have known that there was a substantial likelihood that consumers, like Decedent, who purchased their nitrous oxide products at the volume and frequency they were purchased by Decedent, and whose purchase history included paraphernalia such as a mask, tubing and a regulator valve, would be using the nitrous oxide products as recreational inhalants – putting such consumers at significant risk of suffering injuries.

72.     Despite this, Amazon did not take reasonable steps to prevent or reduce the danger to consumers.  Amazon did not take any steps to monitor the volume or frequency of Decedent's nitrous oxide purchases.  Nor did Amazon take any steps to intervene – by either

COMPLAINT
PAGE - 24

CORRIE YACKULIC LAW FIRM, PLLC
101 YESLER WAY, SUITE 600
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

limiting sales or providing an adequate warning of the harms of inhaling nitrous oxide – once the volume and frequency of Decedent's nitrous oxide purchases clearly indicated those products were being purchased for recreational inhalation rather than culinary use.

73. At no time did Defendants adequately instruct Decedent not to inhale nitrous oxide or adequately warn Decedent about the dangers of using nitrous oxide as a recreational drug. Defendants failed to include adequate warnings regarding the risks of inhaling nitrous oxide in the product's packaging or promotional materials. Defendants also failed to include adequate warnings regarding the risks of inhaling nitrous oxide on the Amazon website and related platforms.

74. Decedent was not aware of the risks associated with recreational use of nitrous oxide. Instead, Decedent believed that Defendants' nitrous oxide products were safe or presented limited and reasonable risk when used recreationally. Had Decedent known the risks associated with nitrous oxide inhalation, Decedent would have avoided, limited, or modified the means of nitrous oxide inhalation.

75. On or about December of 2023, Decedent was admitted to the hospital. During her hospital stay, Decedent was determined to have suffered nerve damage of such severity she was never again able to walk without using a walker.

76. In May of 2024, Decedent went to Piedmont Hospital Cartersville which sent her to Summit Ridge Rehabilitation.

77. On May 14, 2024, while at Summit Ridge Rehabilitation, Decedent died from a pulmonary embolism.

COMPLAINT
PAGE - 25

78.     As a result of Decedent's use of Defendants' nitrous oxide products, Decedent required treatment by medical professionals and suffered physical injuries and harm including vitamin B12 depletion, myelopathy, numbness, peripheral neuropathy, gait disturbance, numbness and weakness in her extremities, loss of coordination, loss of the ability to walk independently, difficulty speaking, difficulty swallowing, cognitive and neurological impairments, extreme paranoia, anxiety, depression, conscious pain and suffering, and other injuries, including death.

## V.     PUNITIVE DAMAGES ALLEGATIONS

79.     Defendants' conduct was, and is, of the type for which applicable laws provide for the imposition of punitive damages.

80.     The acts and omissions of Defendants made dangerous downstream consumer use of nitrous oxide as an inhalant, not merely possible, but commercially intended and predictable.

81.     Defendants' conduct, as described above, was committed with knowing, conscious, careless, reckless, willful, wanton, malicious, and deliberate disregard for the rights and safety of consumers, including Decedent.  Defendants' acts, omissions, and representations involved an extreme degree of risk considering the probability and magnitude of the harm. Defendants acted with conscious and reckless disregard for human life, safety, and the rights of consumers, including Decedent.  Defendants' conduct and callous disregard for the safety of consumers such as Decedent was so mean, vile, base, and contemptible that it would be looked down on and despised by reasonable people.

COMPLAINT
PAGE - 26

82.     Defendants' conduct was not accidental or merely negligent, but was willful, wanton, and motivated by profit. Defendants had actual subjective awareness of the risk but proceeded with conscious indifference to the rights, safety, and welfare of Decedent and other consumers.

83.     Defendants knew their nitrous oxide canisters would be used for recreational inhalation and knew or should have known of the serious risks associated with that use. Despite this knowledge, Defendants intentionally marketed and promoted their products in a manner that encouraged human consumption while failing to provide adequate warnings regarding the risk of severe injury. By omitting adequate warnings, Defendants deprived consumers of the ability to make informed decisions to not purchase and consume nitrous oxide products. Defendants profited by continuing to sell nitrous oxide products without adequate warnings, demonstrating a conscious and ongoing disregard for consumer safety. Defendants knew they could profit by selling nitrous oxide to consumers for recreational consumption. As a direct result of Defendants' knowing and malicious conduct, Decedent suffered severe harm and may require future medical care.

COMPLAINT
PAGE - 27

CORRIE YACKULIC LAW FIRM, PLLC
101 YESLER WAY, SUITE 600
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

## VI.        DISCOVERY RULE AND FRAUDULENT CONCEALMENT

84.     This action is timely filed pursuant to the discovery rule. Despite acting with reasonable diligence, Decedent did not learn of the link between Decedent's injuries and Decedent's use of the nitrous oxide products prior to her death; information regarding the link between nitrous oxide products and Decedent's injuries and death was not discovered until after Decedent's death and within the applicable limitations period. Prior to that time, Plaintiff could not have discovered, through the exercise of reasonable diligence, that long-term exposure to nitrous oxide was injurious to human health. A reasonable and diligent investigation by Plaintiff would not have revealed that nitrous oxide could cause Decedent's injuries and death.

85.     The expiration of any applicable statute of limitations has been tolled by reason of Defendants' fraudulent concealment. Through affirmative misrepresentations and omissions, Defendants willfully, wantonly, actively, and intentionally concealed from Decedent and from Plaintiff the true risks associated with inhaling nitrous oxide. Plaintiff did not discover and did not know of facts that would cause a reasonable person to suspect that Decedent's injuries were caused by inhaling nitrous oxide. Nor would a reasonable and diligent investigation by Plaintiff have disclosed that nitrous oxide caused her injuries during the limitations period.

CORRIE YACKULIC LAW FIRM, PLLC
101 YESLER WAY, SUITE 600
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

## VII.      CAUSES OF ACTION

### COUNT I
### STRICT PRODUCTS LIABILITY – DESIGN DEFECT
*(Against Both Defendants)*

86.    Plaintiff incorporates the above allegations as though fully set forth herein. This count is brought under the Washington Product Liability Act ("WPLA"), RCW § 7.72 et seq. Amazon is liable as a "manufacturer" under RCW § 7.72.040(2). The nitrous oxide canisters purchased by Decedent were marketed, distributed, and sold by Defendants in the regular course of their businesses.

87.    At the time of Decedent's injuries, the nitrous oxide products distributed and sold by Defendants were in a defective condition and were unreasonably dangerous when put to their reasonably anticipated use in that they:

    a.    Were designed and sold for recreational use;

    b.    Incorporated features that enhanced recreational use as an inhalant but served no legitimate objective for the products' stated purpose as a culinary product;

    c.    Were provided to consumers in unreasonably large quantities that made them ill-suited for any purpose other than inhalation and that greatly increased the risk of harm from repeated inhalation;

    d.    Were addictive;

    e.    Failed to incorporate abuse-deterrent designs such as adding a bitterant to the gas;

    f.    Failed to incorporate abuse-deterrent designs, such as designing the canister to be incompatible with standard nozzles and inhalation accessories;

    g.    Failed to incorporate injury-reducing designs, such as mixing the nitrous oxide with an appropriate amount of oxygen;

    h.    Failed to contain adequate warnings against and about the dangers and specific injuries of inhalation;

    i.    Used names, colors, branding, advertising, imagery, and components that promoted and enabled nitrous oxide inhalation and thereby contradicted, discredited, and muted any minimal warning that may have existed on the packaging about not using the product as an inhalant; and

    j.    Such further defects as discovery and the evidence shall reveal.

CORRIE YACKULIC LAW FIRM, PLLC
101 YESLER WAY, SUITE 600
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

88.     The design defect described herein existed at the time the product left Defendants' possession and control and was a producing cause of Decedent's injuries.

89.     Inhalation was a reasonably anticipated and commercially intended use for the nitrous oxide sold by Defendants, based on Defendants' marketing, promotion, packaging, and distribution choices.  Inhalation of the nitrous oxide was a reasonably anticipated use of the product, given Defendants' branding, packaging, choice of sales channels, accessories, and the volume and manner in which the products were sold.

90.     The risk of injury to consumers who were enticed to purchase the nitrous oxide canisters for recreational use as an inhalant outweighed any minimal utility from the challenged design features that promoted or enabled inhalation. An ordinary consumer would not expect the nitrous oxide products purchased from Defendants to carry a significant risk of serious injury and death.   The nitrous oxide canisters were more dangerous than an ordinary consumer would expect.

91.     Safer alternative designs for nitrous oxide canisters existed and were feasible at the time of manufacture, including (a) adding a bitterant to the nitrous oxide that would make the nitrous oxide unappealing for inhalation, (b) ceasing to include or provide nozzles with nitrous oxide tanks, (c) making nitrous oxide tanks incompatible with nozzles or inhalation accessories, (d) limiting canister size, (e ) mixing the nitrous oxide gas with an appropriate concentration or oxygen, (f)  instructing and warning that nitrous oxide should not be inhaled  unless mixed with an appropriate concentration of oxygen. These alternative designs would have significantly reduced the risk of inhalation-related injuries from nitrous

COMPLAINT
PAGE - 30

oxide without impairing its culinary utility.    These alternatives were economically and technologically feasible.

92.    Defendants were not passive or innocent distributors or sellers of nitrous oxide products.  Defendants exercised substantial control over the warnings, instructions, and information provided to consumers, which warnings and instructions were inadequate at the time the product left the Defendants' control and which inadequate warnings and instructions caused Decedent's injuries. Defendants made express factual representations about the safety of nitrous oxide as an inhalant that were incorrect, such representations were relied upon by Decedent and caused Decedent's injury. Defendants altered or modified the nitrous oxide products by offering free nozzles that allowed the nitrous oxide to be accessed for inhalation. Defendants knew that the nitrous oxide products were defective in their warnings and design at the time Defendants supplied and sold the product and Decedent's injuries resulted from those defects.

93.    Upon information and belief, manufacturers of certain of the nitrous oxide products used by Decedent are insolvent, not subject to service of process in Washington, not subject to the jurisdiction of the Court, and/or it is highly probable that Plaintiffs would be unable to enforce a judgment against them.  Accordingly, Defendants are subject to the liability of a manufacturer under RCW 7.72.030.

94.    As a direct and proximate result of Defendants' failures to provide adequate warnings about the dangers of nitrous oxide inhalation, Decedent sustained injuries, including a severe addiction to nitrous oxide, and other severe physical, mental and emotional injuries, past and future pain and suffering, permanent cognitive and neurological

CORRIE YACKULIC LAW FIRM, PLLC
101 YESLER WAY, SUITE 600
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

impairment, and death. Decedent also incurred economic damages, including but not limited to medical expenses, lost income, and other damages.

95.    The aforesaid acts, omissions and/or representations of Defendants involved an extreme degree of risk considering the probability and magnitude of the harm. Defendants had actual subjective awareness of the risk but proceeded with conscious indifference to the rights, safety and welfare of Decedent and other consumers. Plaintiff is entitled to punitive damages from Defendants to punish and to deter Defendants and others from similar conduct in the future.

96.    WHEREFORE, Plaintiff prays for judgment against Defendants for compensatory damages, punitive damages, costs herein incurred, prejudgment interest, post-judgment interest, attorneys' fees and all other and further relief that may be just and proper under the circumstances.

## COUNT II
## STRICT PRODUCTS LIABILITY – FAILURE TO WARN
*(Against All Defendants)*

97.    Plaintiff incorporates the above allegations as though fully set forth herein.

98.    This count is brought under the Washington Product Liability Act ("WPLA"), RCW § 7.72 et seq. Amazon is liable as a "manufacturer" under RCW § 7.72.040(2).

99.    The nitrous oxide products purchased by Decedent were marketed, promoted, advertised, distributed, supplied, merchandised, and sold by Defendants in the regular course of their businesses.

COMPLAINT
PAGE - 32

CORRIE YACKULIC LAW FIRM, PLLC
101 YESLER WAY, SUITE 600
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

100.    At all relevant times, Amazon had control over nitrous oxide canisters sold on the Amazon website and through Amazon's other retail channels.  Amazon had control over how nitrous oxide products appeared on their website and what text, graphics and other promotional materials and associated products appeared alongside the nitrous oxide products. Amazon sold and distributed nitrous oxide products to consumers, including Decedent.

101.    Defendants are strictly liable for injuries incurred by Decedent due to Decedent's use of nitrous oxide canisters sold by Defendants because the nitrous oxide products were not reasonably safe in construction or were not reasonably safe because they did not conform to the applicable express or implied warranties.

102.    At the point in time when Decedent purchased and inhaled the nitrous oxide products, Defendants were aware that inhaling nitrous oxide poses serious risks. The health risks associated with nitrous oxide inhalation were known to Defendants based on generally accepted knowledge in the scientific community at the time.

103.    At the time of Decedent's injuries, the nitrous oxide products were in a defective condition and were unreasonably dangerous when put to their reasonably anticipated use in that they failed to adequately warn about the risks of nitrous oxide inhalation, including the risks of addiction and severe health consequences.

104.    The nitrous oxide products marketed, advertised, distributed, and sold to Decedent by Defendants are defective because the products fail to warn consumers, including Decedent, through the labeling, packaging, promotion, marketing, advertising, websites, modes of electronic commerce, or otherwise that:

COMPLAINT
PAGE - 33

CORRIE YACKULIC LAW FIRM, PLLC
101 YESLER WAY, SUITE 600
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

a.  Inhaling nitrous oxide products can cause, maintain, or aggravate nitrous oxide addiction and subject consumers to the health hazards associated with addiction;

b.  Inhaling nitrous oxide products can deliver nitrous oxide at greater levels than medically recommended;

c.  Inhaling nitrous oxide products carries risks of behavioral, cognitive, and mental health injuries, neurological injuries, paralysis, severe neuropathy, inability to walk, inability to perform daily activities, pulmonary injuries, long-term vitamin B12 deficiencies, and other harmful effects;

d.  The repeated use of nitrous oxide can cause serious and permanent physical and neurological injuries and death;

e.  Certain medical symptoms of inhaling nitrous oxide require prompt medical care and treatment, including identification of such symptoms and instructions on how to determine when to seek medical treatment;

105.    The warning defects existed at the time the products left Defendants' control and rendered the products unreasonably dangerous.

106.    Any minimal warnings that may have accompanied the nitrous oxide products were so mild in tone and so general in content as to fail to adequately warn consumers of the severe risks of inhalation. The warnings provided by Defendants failed to convey the level of information that a consumer would expect regarding risks associated with use of the products in a manner reasonably foreseeable to Defendants.

107.    Amazon did not take any steps to monitor the volume or frequency of nitrous oxide canister purchases by consumers such as Decedent.  Amazon did not limit sales or provide adequate warning information to persons, like Decedent, whose volume, frequency and types of nitrous oxide product purchases clearly indicated that the nitrous oxide was being purchased for recreational inhalation rather than culinary use.

108.    Decedent did not know and could not have reasonably been expected to know of the risks associated with recreational inhalation of nitrous oxide.  A manufacturer or distributor has a duty to adequately warn of potential risks or hazards where there is unequal

COMPLAINT
PAGE - 34

knowledge, actual or constructive, of a dangerous condition and the Defendant (possessing such knowledge) knows or should know that harm might or could occur if no warning is given.

109.    To the extent the nitrous oxide products' packaging contained warning language, such warnings were inadequate in size, color, prominence, wording or substance to convey the seriousness of the risk. Additionally, the use of names, colors, branding, flavorings, imagery, and components (*e.g.* nozzles, regulators, balloons) that promoted and enabled nitrous oxide inhalation served to contradict, discredit and mute any minimal warning that may have existed on the packaging about not using the product as an inhalant.

110.    The failure to adequately warn about the defective nitrous oxide products created a danger of the injuries described herein that were reasonably foreseeable at the time of labeling, design, distribution, and sale of nitrous oxide.

111.    Had adequate warnings been provided, Decedent would not have inhaled Defendants' nitrous oxide products and the injuries Decedent suffered would not have occurred.

112.    Defendants were not passive or innocent sellers of nitrous oxide products. Defendants exercised substantial control over the warnings, instructions, and information provided to consumers, which warnings and instructions were inadequate at the time the product left the Defendants' control and which inadequate warnings and instructions caused Decedent's injuries. Defendants made an express factual representation about the safety of nitrous oxide as an inhalant that were incorrect, such representations were relied upon by Decedent and caused Decedent's injury. Defendants altered or modified the nitrous oxide

COMPLAINT
PAGE - 35

products by offering free nozzles that allowed the nitrous oxide to be accessed for inhalation. Defendants knew that the nitrous oxide products were defective in their warnings and design at the time Defendants supplied and sold the product and Decedent's injuries resulted from those defects.

113.    Upon information and belief, manufacturers of certain of the nitrous oxide products used by Decedent are insolvent, not subject to service of process in Washington, not subject to the jurisdiction of the Court, and/or it is highly probable that Plaintiffs would be unable to enforce a judgment against them.

114.    Defendants' failures to provide adequate warnings and instructions accompanying their nitrous oxide products was a substantial factor in causing Decedent's injuries.

115.    As a direct and proximate result of Defendants' failures to provide adequate warnings about the dangers of nitrous oxide inhalation, Decedent sustained injuries, including a severe addiction to nitrous oxide, and other severe physical, mental and emotional injuries, and past and future pain and suffering, permanent cognitive and neurological impairment, and death.  Decedent also incurred economic damages, including but not limited to medical expenses, lost income, and other damages.

116.    The aforesaid acts, omissions and/or representations of Defendants involved an extreme degree of risk considering the probability and magnitude of the harm. Defendants had actual subjective awareness of the risk but proceeded with conscious indifference to the rights, safety, and welfare of Decedent and other consumers. Plaintiff is entitled to punitive

COMPLAINT
PAGE - 36

damages from Defendants to punish and to deter Defendants and others from similar conduct in the future.

122.    WHEREFORE, Plaintiff prays for judgment against Defendants for compensatory damages, punitive damages, costs herein incurred, prejudgment interest, post-judgment interest, attorneys' fees and all other and further relief that may be just and proper under the circumstances.

## COUNT III
## NEGLIGENCE
*(Against Both Defendants)*

123.    Plaintiff incorporates the above allegations as though fully set forth herein.

124.    Amazon marketed, promoted, distributed, supplied, and sold nitrous oxide canisters in the regular course of its businesses through its online store – including those products inhaled by Decedent.

125.    At all relevant times, Amazon sold nitrous oxide canisters through its online store. Amazon had control over how nitrous oxide canisters appeared on the Amazon website. Amazon also had control over what text, graphics, and information appeared alongside nitrous oxide product listings. Amazon further controlled what products were promoted as related to nitrous oxide canisters. Amazon controlled what reviews were displayed. Amazon influenced its customers' access to and purchase of nitrous oxide products.

126.    At all times relevant, Amazon owed the public, including Decedent, a duty to exercise reasonable care and act as a reasonably prudent seller and supplier when marketing,

CORRIE YACKULIC LAW FIRM, PLLC
101 YESLER WAY, SUITE 600
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

promoting, supplying, selling, or otherwise placing in the stream of commerce nitrous oxide, including the nitrous oxide canisters at issue in this lawsuit.

127. Amazon owed a duty to exercise ordinary care to prevent nitrous oxide products they promoted, supplied, and distributed from being foreseeably misused in a manner that posed a serious risk of injury, where such misuse was reasonably anticipated based on the nature of the product, its design features, packaging, branding, and the channels through which it was sold.

128. Amazon owed a duty arising from its knowledge that customers purchasing its nitrous oxide products intended to inhale the nitrous oxide.

129. Amazon failed to exercise ordinary care, thereby breaching the duty owed to Decedent and others in one or more of the following respects:

a. Selling nitrous oxide products, particularly products that cater to recreational use due to their size, flavoring, branding or accessories, with knowledge that inhalation of nitrous oxide is illegal and dangerous;
b. Supplying and dispensing nitrous oxide products when it knew or should have known that the product would be used as a recreational drug;
c. Dispensing nitrous oxide chargers/containers with reckless disregard as to whether the substance was likely to be consumed, inhaled, or used as a recreational drug by the person to whom it was supplied;
d. Failing to provide adequate warnings or instructions for nitrous oxide products sold through the Amazon electronic store;
e. Failing to communicate the health risks associated with nitrous oxide products;
f. Failing to take steps to monitor the volume or frequency of its customer's nitrous oxide product purchases and take reasonable steps – including, but not limited to, limiting sales, providing adequate warnings about the harms associated with nitrous oxide inhalation – once the volume and frequency of customers', including Decedent's, nitrous oxide purchases indicated such products were being used for recreational inhalation rather than culinary uses;
g. Recommending, supplying and selling inhalant paraphernalia, knowing that customers purchasing such paraphernalia in connection with nitrous oxide products intended such products to be used to inhale ingest, use or otherwise introduce nitrous oxide into the human body;

COMPLAINT
PAGE - 38

h.  Supplying customers with large quantities of nitrous oxide that indicated customers were using the nitrous oxide as a recreational drug;

i.  Failing to institute and maintain adequate policies and procedures for ensuring the nitrous oxide canisters it sold and supplied were not utilized for illicit purposes;

j.  Marketing, supplying, and selling nitrous oxide canisters and paraphernalia that featured names, colors, designs, and flavors that suggest to users such as Decedent that the nitrous oxide could be misused for illicit and recreational purposes;

k.  Promoting and encouraging recreational nitrous oxide use;

l.  Targeting potential users of recreational nitrous oxide use;

m.  Marketing nitrous oxide with items associated with drug culture, including balloons, nozzles, tubing, and merchandise suggestive of recreational use, with knowledge that so doing encourages and enables use of nitrous oxide for illicit purposes;

n.  Failing to adequately warn, instruct, or direct consumers about the consequences of inhaling nitrous oxide;

o.  Marketing, distributing and selling nitrous oxide containers with labels that are false and misleading;

p.  Marketing and promoting nitrous oxide products in a manner that encouraged inhalation and thereby contradicted, discredited, and muted, any minimal warning that may have existed on the packaging about not using the product as an inhalant;

q.  Failing to provide adequate warnings and instructions after the product was manufactured.  Based on the FDA Advisory and other factors, Amazon learned, or a reasonably prudent seller should have learned, about the dangers associated with nitrous oxide canisters  which rendered the product unsafe beyond the extent contemplated by an ordinary user – Defendants failed to adequately warn or instruct about that danger in the manner that a reasonably prudent seller would have done in the same or similar circumstances; and

r.  Such further negligence and carelessness as discovery and the evidence will reveal.

130.    When inhaled by Decedent, the nitrous oxide products were in the same condition as when they were distributed, marketed, supplied and sold by Amazon.

131.    Amazon knew or should have known that certain of its customers, like Decedent, were purchasing nitrous oxide with intent to use it as a recreational drug.  Amazon nonetheless persisted in selling, supplying and distributing nitrous oxide products to

COMPLAINT
PAGE - 39

Decedent without adequate warnings and with flagrant, reckless, and willful disregard for whether it was likely to be consumed by Decedent and cause harmful effects.

132.     That consumers, including Decedent, would purchase and inhale nitrous oxide products sold by Amazon was the natural and foreseeable result of Amazon's conduct.

133.     Amazon knew that injury and death were substantially likely to occur as a result of the unreasonable, intentional, reckless, and careless acts or omissions as described above.

134.     Had Amazon not breached its duty, Decedent would not have inhaled Defendants' nitrous oxide products or, at a minimum, would not have inhaled nitrous oxide products at the same concentration and frequency. Had Defendants provided adequate warnings and instructions about the risks of inhaling nitrous oxide, Decedent would have avoided, limited or modified her nitrous oxide inhalation to avoid or reduce injury.

135.     Amazon's negligent acts were a substantial factor in causing Decedent's injuries and death.

136.     As a direct and proximate result of the negligence of Amazon, Decedent sustained injuries including: a severe addiction to nitrous oxide, other severe physical, mental and emotional injuries, past and future pain and suffering, permanent cognitive and neurological impairment, and death.

137.     The aforesaid acts, omissions and/or representations of Defendants involved an extreme degree of risk considering the probability and magnitude of the harm. Defendants had actual subjective awareness of the risk but proceeded with conscious indifference to the rights, safety, and welfare of Decedent and other consumers. Plaintiff is entitled to punitive

COMPLAINT
PAGE - 40

damages from Defendants to punish and to deter Amazon and others from similar conduct in the future.

138.    WHEREFORE, Plaintiff prays for judgment against Amazon for compensatory damages, punitive damages, costs herein incurred, prejudgment interest, post-judgment interest, attorneys' fees and all other and further relief that may be just and proper under the circumstances.

### COUNT IV
### OUTRAGE
*(Against Both Defendants)*

139.    Plaintiff realleges all prior paragraphs as if set forth fully herein.

140.    Amazon's conduct, as described in this Complaint, went beyond all possible bounds of decency and can only be regarded as atrocious and utterly intolerable in a civilized society.

141.    Amazon's conduct was extreme and outrageous.

142.    Amazon, by its outrageous conduct, intentionally and/or recklessly caused Decedent severe emotional distress, excruciating physical pain, and death.

143.    Amazon, by its outrageous conduct, intentionally and/or recklessly caused Decedent's family, including Plaintiff, severe emotional distress.

144.    WHEREFORE, Plaintiff prays for judgment against Amazon for compensatory damages for Decedent's pre-death physical and mental pain and suffering, disability, loss of earnings and earning potential, medical expenses, the mental and emotional distress of Decedent's family, funeral and burial expenses, and other compensatory damages, punitive damages, costs herein incurred, prejudgment interest, post-judgment interest,

COMPLAINT
PAGE - 41

CORRIE YACKULIC LAW FIRM, PLLC
101 YESLER WAY, SUITE 600
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

attorneys' fees and all other and further relief that may be just and proper under the circumstances.

## VIII.    DAMAGES

145.    As a direct and proximate result of Defendants' wrongful conduct, Decedent sustained serious and permanent injuries, including a severe addiction to nitrous oxide, and other severe physical, mental and emotional injuries, past and future pain and suffering, permanent cognitive and neurological impairment, and death. Decedent also incurred economic damages, including but not limited to medical expenses, lost income, and other compensable damages.

146.    As a direct and proximate result of Defendants' wrongful conduct and Decedent's death, the statutory beneficiaries have sustained damages, including but not limited to: (1) loss of Decedent's love, companionship, care, and consortium; (2) loss of Decedent's services and support; (3) loss of financial contributions, including net accumulation; (4) emotional distress and mental anguish; (5) other non-economic and economic damages as permitted by law.

147.    As a direct and proximate result of Defendants' wrongful conduct, Decedent's Estate has incurred and/or is liable for damages, including but not limited to, medical and hospital expenses; funeral and burial expenses; lost earnings and loss of earning capacity from the time of injury to the time of death; Decedent's pre-death pain and suffering, anxiety, emotional distress, and loss of enjoyment of life (to the extent recoverable under Washington law); and other economic and non-economic damages recoverable by the Estate under RCW § 4.20.046 and/or RCW § 4.20.060.

COMPLAINT
PAGE - 42

CORRIE YACKULIC LAW FIRM, PLLC
101 YESLER WAY, SUITE 600
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

148.    The aforesaid acts, omissions and/or representations of Defendants involved an extreme degree of risk considering the probability and magnitude of the harm. Defendants had actual subjective awareness of the risk but proceeded with conscious indifference to the rights, safety and welfare of Decedent and other consumers. Plaintiff is entitled to punitive damages from Defendants to punish and to deter Defendants and others from similar conduct in the future.

122.    The aforementioned damages are in an amount which will be proved at the time of trial.

### IX.    NOTICE OF DEMAND FOR PRESERVATION

123.    This notice is to formally demand preservation of any evidence related to the subject incident. If Defendants fail to properly secure and preserve these important pieces of evidence, there may be a legal presumption that the evidence would have been harmful to Defendants' side of the case. Failure to preserve and maintain this evidence may result in the imposition of sanctions by a Court, after proper motion and hearing. The destruction, alteration, or loss of any evidence that Defendants are required to maintain could prove detrimental to Defendants' defense and request is made that it be preserved and not be destroyed, modified, altered, repaired or changed in any manner. IMMEDIATELY PRINT AND SAVE ON PAPER ALL ELECTRONIC RECORDS RELATED TO THE SUBJECT OF THIS PETITION IN ADDITION TO ELECTRONICALLY PRESERVING ALL ELECTRONIC RECORDS.

### X.    REQUEST FOR TRIAL BY JURY

124.    Plaintiff hereby requests a trial by jury on all counts and as to all issues.

COMPLAINT
PAGE - 43

## XI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests the following relief:

      a.     For special damages in an amount to be proven at the time of trial;

      b.     For general damages in an amount to be proven at the time of trial;

      c.     For punitive damages in an amount to be proven at the time of trial;

      d.     For a judgment of liability against Amazon;

      e.     For costs and disbursements herein;

      f.     For pre- and post-judgment interest as allowed by law;

      g.     For reasonable attorney fees and costs; and

      h.     For such other and further relief as this Court deems just and equitable.

DATED: May 13, 2026               Respectfully submitted,

CORRIE YACKULIC | LAW FIRM PLLC

*/s/ Corrie J. Yackulic*
CORRIE YACKULIC, WSBA # 16063
101 Yesler Way, Ste. 600
Seattle, WA 98104
Phone: (206) 787-1915
Email: corrie@cjylaw.com


**FREESE AND GOSS, PLLC**
Tim K. Goss (*PHV forthcoming*)
Tim@freeseandgoss.com
Richard A. Freese (*PHV forthcoming*)
Rich@freeseandgoss.com
Jeff Kuntz (*PHV forthcoming*)
Jeff@freeseandgoss.com
Yvette Diaz (*PHV forthcoming*)
Yvette@freeseandgoss.com
Catharine Greer Goss (*PHV forthcoming*)
Greer@freeseandgoss.com
3500 Maple Ave, Suite 1100

COMPLAINT
PAGE - 44

CORRIE YACKULIC LAW FIRM, PLLC
101 YESLER WAY, SUITE 600
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

Dallas, TX  75219
(214) 761-6610 Telephone


**TILLOTSON PATTON**
Jeffrey M. Tillotson (*PHV forthcoming*)
jtillotson@tillotsonlaw.com
Mollie E. Mallory (*PHV forthcoming*)
mmallory@tillotsonlaw.com
1201 Main Street, Suite 1300
Dallas, Texas 75202
(214) 382-3041 Telephone
(214) 292-6564 Facsimile

**MATTHEWS AND ASSOCIATES**
David P. Matthews (*PHV forthcoming*)
dmatthews@thematthewslawfirm.com
2905 Sackett St.
Houston, TX  77098
(713) 522-5250 Telephone

COMPLAINT
PAGE - 45

CORRIE YACKULIC LAW FIRM, PLLC
101 YESLER WAY, SUITE 600
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725